## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| MARION I. HOWELL and FRANCIS L. HOWELL,<br><br>Plaintiffs,<br><br>vs.<br><br>TRAVIS EARL, individually and as agent of Gallatin County Sheriff's Department, State of Montana, et al.,<br><br>Defendants. | CV 13–48–BU-DWM–JCL<br><br>FINDINGS & RECOMMENDATION |

This civil rights action has its genesis in Plaintiffs Francis and Marion Howells' encounter with law enforcement officers of the Gallatin County, Montana Sheriff's Office and the Montana Highway Patrol. All Defendants move for summary judgment upon all claims advanced by the Howells. For the reasons discussed, the Court recommends the motions be granted except as to: (1) the claims of excessive force and negligence asserted by Francis against Defendants Sheriff's Deputies Travis Earl, Scott Secor, and Kelli Munter, and; (2) the claims of unlawful entry and detention asserted by Marion against Defendants.

Francis, in turn, moves for summary judgment upon his claim of excessive force. The motion is properly denied.

# I.    Background[1]

On June 26, 2011, the Howells' son, Shapleigh Howell, was involved in a single motor vehicle accident which occurred on a road in the area between Belgrade and Manhattan, Montana.  The vehicle involved in the accident – which was owned by Francis and Marion Howell – left the roadway and collided with a trailer.  Shapleigh – who was under the influence of alcohol – immediately telephoned Marion to come pick him up.  With Francis as her passenger, Marion drove her sport utility vehicle to the accidence scene, picked up Shapleigh, and returned to their residence at 175 Rattler Road.

A resident in the area called 911 and reported that she had observed a man walk away from the accident scene and get into the Howells' sport utility vehicle, which then drove about a quarter of a mile to 175 Rattler Road.

Several law enforcement officers from the Gallatin County Sheriffs Department and the Montana Highway Patrol – many of the individuals named as Defendants in this action – responded to the 911 call regarding the accident.  At approximately 11:00 p.m Defendant Montana Highway Patrol Troopers Michael Walrath, James Sulages, and Justin Braun responded to the scene of the accident.  At roughly the same time, Gallatin County Sheriffs Deputies Travis Earl, Scott

---

[1] Consistent with well-established summary judgment standards, the following facts are taken from the materials of record and, where disputed, viewed in the light most favorable to the non-moving party.

Secor, and Kelli Munter were dispatched to 175 Rattler Road, having been advised that the person believed to be the driver had been picked up and taken to that address.

When the Deputies arrived at the property, they observed Fancis in his truck in the driveway. Upon exiting his truck, Francis began yelling angrily about the Deputies' presence on his property. As Deputy Earl engaged him, Francis put his hands in his pockets. Deputy Earl directed Francis to keep his hands out of his pockets. Francis initially complied, but then kept putting his hands back in his pockets. According to the Sheriffs Deputies, Deputy Earl instructed Francis to take a step forward, turn around, and put his hands behind his back. But as Deputy Earl approached him, Francis turned back around to face him. Deputy Earl then took hold of Francis's left arm, while Deputy Secor took hold of his right arm and executed an "arm bar" maneuver. The Deputies state that Francis actively resisted their efforts to restrain him, so they pinned him against his truck. Deputy Munter then handcuffed Francis's hands. Several minutes later, after Francis calmed down, the Deputies removed his handcuffs.

Francis does not totally agree with the Deputies version of events. But he does not dispute that he initially resisted the Deputies' efforts to restrain him. He nonetheless claims, however, that Deputy Secor exerted enough force on his arms that he was lifted off his feet and onto the hood of his truck. Francis claims this

force was excessive and injured his right shoulder.

Meanwhile, at the accident scene, Trooper Walrath learned that someone had taken the person believed to have been the driver to 175 Rattler Road. Trooper Walrath directed Trooper Sulages to go that address, ascertain the identity of the driver, and bring him back to the crash site.

As Francis's encounter with law enforcment transpired, different events were developing at the residence. Trooper Walrath directed Trooper Sulages to go to the Howells' home, ascertain the identity of the driver, and bring the driver back to the crash site. When Trooper Sulages arrived at the house, he knocked on the door but did not receive a response. As Trooper Sulages investigated outside the home, Deputy Secor saw the Howells' minor grandson, CC, nearby. Deputy Secor approached CC and asked him if there was an adult or family member around. CC indicated that his grandmother, Marion, was in the house. Deputy Secor asked CC to go get his grandmother, and followed CC to the front door of the house. CC opened the front door and went inside.

The parties dispute what happened next. According to Deputy Secor, CC held the front door open for him, so he went inside the house and spoke briefly with Marion. Trooper Sulages then explains that while he was outside he heard "somebody" state that they had gotten into the house, so he returned to the door and found Deputy Secor holding it open. Trooper Sulages recalls asking Marion

4

who had been driving the vehicle when it crashed and whether the driver was injured, and Marion stating that she did not know.

According to Marion, however, Deputy Secor and Trooper Sulages entered her home together, and without her consent. As Marion describes it, "two armed, uniformed law enforcement officers … barged into my house by opening the door and entering my living room. … They forced their way into my house." (Doc. 74-3, at 46). Marion claims that she was frightened and repeatedly asked them to stop questioning her so she could speak with an attorney.

At approximately 11:15 p.m., Marion accompanied Trooper Sulages back to the scene of the accident, riding in the back seat of his patrol car. When they arrived, they met with Troopers Waltrath and Braun – both of whom had remained at the scene since their arrival some 15 minutes earlier. Marion confirmed that she and Francis owned the vehicle that had crashed, but when asked by Trooper Walrath whether she knew who had been driving she said "I might have an idea, but I don't want to say because I don't know who it was for sure." (Doc. 66, Ex J, 01:55-2:03). Trooper Walrath asked Marion if the driver was a relative, and she responded "Probably. I don't want to say any more." (Doc. 66, Ex. J. 03:53-04:02). Marion told Troopers Walrath and Sulages that she did not know for sure who had been driving the vehicle and stated that she wanted to talk to an attorney. Trooper Walrath then instructed Marion to "go ahead and have a seat in the back

of my vehicle and think about it, and then when I get done taking pictures [of the scene] we'll see where we're gonna go, if you're gonna go to jail or if we're gonna have [inaudible]." (Doc. 66, Ex. J, at 5:20-5:31). Marion followed Trooper Walrath to his patrol car and got in the back seat. Approximately 25 minutes later, Trooper Sulages transported Marion back to her home.

As this was happening, Trooper Sulages returned once again to the Howells' property to speak with Francis. He asked Francis to identify the person who had been driving the vehicle involved in the crash and asked for permission to enter the house and check on the driver's condition. Francis refused to identify the driver or give permission to enter the home, and Trooper Sulages placed him under arrest.

In the days and weeks that followed, Marion was cited by Trooper Walrath for obstruction of justice and Shapleigh was charged with four criminal offenses. The charge against Marion was later dismissed, but Shapleigh was convicted of negligent endangerment and obstructing a peace officer.

The Howells filed this lawsuit nearly two years later. They advance claims under 42 U.S.C. § 1983 against Defendants for allegedly violating their Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure, unlawful prosecution, and the use of excessive force. The Howells also assert state law claims for false arrest, malicious prosecution, negligence, gross

negligence, negligence per se, negligent and intentional infliction of emotional distress, acting in concert, defamation, punitive damages, and violations of the Montana Constitution.

## II.     Applicable Law

### A.     Summary Judgment Standards

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

A party moving for summary judgment who does not have the burden of persuasion at trial must produce evidence which either:  (1) negates an essential element of the non-moving party's claim, or (2) shows that the non-moving party does not have enough evidence of an essential element to ultimately carry his burden at trial.  *Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue [of material fact] for trial."  *Celotex Corp. v. Cattrett*, 477 U.S. 317,

324 (1986).

In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and the court must construe all facts in the light most favorable to the non-moving party. *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) (citation omitted). When presented with cross-motions for summary judgment on the same matters, the court must "evaluate each motion separately, giving the non-moving party the benefit of all reasonable inferences." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

### B.   Application of Montana Law

In view of the Howells' claims under federal law, the Court has supplemental jurisdiction over their state law claims under 28 U.S.C. § 1367(a). "[A] federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Bass v. First Pacific Networks, Inc.*, 219 F.3d 1052, 1055 n.2 (9th Cir. 2000). "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980).

### III.   Discussion

### A.    Francis's Claims

Francis alleges that Deputies Earl, Munter, and Secor are liable under 42 U.S.C. § 1983 for violating his Fourth Amendment rights under the United States Constitution by unlawfully detaining him, arresting him, and subjecting him to excessive force.

Section 1983 permits claims under federal law against a local governmental entity, or a state official or employee, if the plaintiff can establish that the defendant was (1) acting under color of state law, and (2) deprived the plaintiff of a federal right secured by the Constitution or laws of the United States.  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).  Deputies Earl, Munter, and Secor have raised qualified immunity as a defense to Francis's § 1983 claims.

As state actors, law enforcement officers like Deputies Earl, Munter, and Secor are entitled to qualified immunity from liability in a § 1983 action if their conduct "either does not violate a federal constitutional right, or the constitutional right was not clearly established on the date of the alleged violation."  *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Qualified immunity provides an immunity from suit rather than a mere defense to liability."  *Mattos v. Agarano*, 590 F.3d 1082, 1086 (9th Cir. 2010).

In addressing a law enforcement officer's claim of qualified immunity, a

9

court must employ the two-part analysis established by the United States Supreme Court in *Saucier*. The "threshold question" under the *Saucier* analysis is whether "[t]aken in the light most favorable to the party asserting the injury," the facts as "alleged show the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If there was no constitutional violation, no further inquiry is necessary. *Saucier,* 533 U.S. at 201.

If the facts as alleged do show that the officer's conduct violated a constitutional right, however, the court must next consider "whether the right was clearly established in light of the specific context of the case." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *al-Kidd*, 580 F.3d at 964 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

### 1.     Unlawful Detention

Francis claims that Deputies Earl, Secor, and Munter unreasonably seized him when they first encountered him in the driveway of his residence.

It is well-established that law enforcement officers may make a brief, non-intrusive, investigative *Terry* stop without violating the Fourth Amendment if they have a reasonable suspicion that the individual is involved in criminal activity. *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002). Reasonable suspicion

exists if there are "specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Colin*, 314 F.3d at 442 (*quoting United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000)).

Here, the undisputed facts establish that Deputies Earl, Secor, and Munter had reasonable suspicion to initiate what amounted to a *Terry* stop when they first encountered Francis. Based on the information provided by dispatch, it was objectively reasonable for the Deputies to believe that Francis was himself the driver of the vehicle that had crashed into the trailer home, and had thus committed the offense of negligent endangerment. [2] It would have been equally reasonable for the Deputies to believe based on the information provided by dispatch that Francis was the person who transported the driver from the scene of the accident, and so had committed the offense of obstructing justice.[3] Consequently, under authority of *Terry*, the Deputies were authorized to conduct a

---

[2] Under Montana law, "[a] person who negligently engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of negligent endangerment." Mont. Code Ann. § 45-5-208. The person who it put at risk need not be an "identified individual," which means the presence of houses in proximity to the offender's conduct is sufficient to put another at substantial risk of injury or death. *See, e.g., State v. Brown*, 893 P. 2d 320, 321-22 (Mont. 1995).

[3] A person is guilty of obstructing justice if he purposely "harbors or conceals an offender" or "provides an offender with...transportation...or other means of avoiding discovery or apprehension." Mont. Code. Ann. § 45-7-303(2).

brief investigatory stop of Francis when they first encountered him.

The question remains, however, whether the Deputies violated Francis's Fourth Amendment rights when they subsequently restrained and handcuffed him. "It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable." *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995). "'[T]he use of force during a stop does not convert the stop into an arrest if it occurs under circumstances justifying fears for personal safety.'" *Alexander*, 64 F.3d at 1320 (quoting *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987)). Consistent with this principle, "[a] brief, although complete, restriction of liberty, such as handcuffing, during a *Terry* stop is not a de facto arrest[.]" *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2009).

The events giving rise to Deputies Earl, Secor, and Munter's perceived need to physically restrain Francis are, in substance, largely undisputed. The Deputies arrived at the Howells' residence after dark. Francis was confrontational and yelled at the Deputies to "get the hell off my property." (Doc. 46-9 at 6.) Moreover, it is undisputed that Francis put his hands in his pockets multiple times even after Deputy Earl instructed him not to. Deputy Earl stated that Francis's conduct presented a safety concern for the Deputies on the basis that some sort of

weapon could have been in his pockets, and Francis's continued non-compliant conduct "heightened [the] concern[]" that there may have been a weapon in his pockets.  (Doc. 95-1 at 3 and 4.)  Under those circumstances, the Court concludes the Deputies reasonably believed some level of search or physical restraint was necessary to protect their own safety, and the restraint, by itself, did not violate Francis's Fourth Amendment rights.[4]  Whether the Deputies used excessive force during the course of physically restraining Francis is a separate question.

### 2.    Excessive Use of Force

#### a.    Deputies Earl, Secor, and Munter

Francis contends that Deputies Earl, Secor and Munter used excessive force against him when they physically restrained and handcuffed him.  The Court finds genuine issues of fact exist regarding this claim.

The Fourth Amendment protects against the unreasonable or excessive use of force by a law enforcement officer in physically restraining a citizen.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Excessive force claims must be evaluated "under an objective reasonableness standard."  *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010).  "The 'reasonableness' of a

---

[4]  To the extent Francis asserts a corresponding claim based on the Montana Constitution, that claim fails as a matter of law for the same reasons.  *See, e.g., Todd v. Baker*, 2012 WL 1999529 *8 (D. Mont. 2012) (reasonable suspicion analysis substantively the same under the Montana Constitution and the Fourth Amendment to the United States Constitution).

particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The proper inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. It is imperative to note, however, that the issue of whether an officer used excessive force is "inherently fact specific [and, therefore,] the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and County of San Francisco*, ___ F.3d ___, 2014 WL 1876273, *8 (9th Cir. 2014) (internal question marks omitted).

In assessing whether the amount of force used was constitutionally reasonable as a matter of law, the court "must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances." *Espinosa*, 598 F.3d at 537. "Stated another way, [the court] must 'balance the amount of force applied against the need for that force.'" *Bryan v. MacPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010) (quoting *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)).

This balancing analysis typically involves three steps. *Espinosa*, 598 F.3d

at 537.  First, the court must "assess the severity [or gravity] of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Espinosa*, 598 F.3d at 537 (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)).  Second, the court considers "the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Espinosa*, 598 F.3d at 537.  "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan*, 630 F.3d at 826 (citation and quotation omitted).  Finally, the court balances the gravity of the force used by the officers on the individual against the government's need for that force "to determine whether the force used was greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (citation and quotation omitted).

The physical confrontation began when Deputy Secor grabbed Francis's right arm and executed an arm bar maneuver to control Francis, while Earl grabbed Francis's left arm at the same time.  Francis asserts Deputies Secor and Earl pushed him hard against the truck and exerted such force on his arms that they lifted him onto the hood of his truck.   (Doc. 74-2 at 2.)  Francis specifically testified at his deposition that Secor "jammed my arm behind my back and

essentially picked me up that way with it, with my arm." (Doc. 46-9 at 23.) Trooper Sulages also confirmed that when he arrived at the Howells' home he observed two Sheriff Deputies "picking [Francis] up off the ground." (Doc. 74-3 at 15 and 17.)[5]

There is no dispute that Francis complained to the Deputies that the handcuffs were too tight, and that Deputy Earl checked the handcuffs, but determined they were not too tight. The parties also agree that after the handcuffs were removed, Francis's left wrist was bleeding – but they do not agree on the seriousness of the bleeding. Francis agrees that he did not report any other injury or bruising to the Deputies at the time of the incident. (Doc. 103 at 16). But he claims his arms exhibited bruising two days after the incident and that his right shoulder was injured. Construing the evidence in the light most favorable to Francis, the Court finds the Deputies deployed a significant level of force.

The Court next considers the government's countervailing interests, taking into account the severity of the asserted crime, and whether the individual posed a threat or was resisting. The Deputies suspected Francis had either driven the

---

[5] Francis's counsel confirms that Francis was not knocked to the ground, and that Francis "was standing straight up" with his hands handcuffed behind his back. (Doc. 112 at 4.) Counsel's statements, of course, do not qualify as admissible evidence. But the Court references the statements because there had been confusion between the parties as to whether Francis was knocked to the ground.

vehicle that crashed into the trailer house, or transported that driver of that vehicle to the Howells' residence, neither of which were particularly severe offenses since there were no reports of any injuries at that time.

The use of handcuffs during a temporary detention must be justified by the circumstances. *Meredith v. Erath*, 342 F.3d 1057, 1062 (9th Cir. 2003). "'[H]andcuffing substantially aggravate[s]' the intrusiveness' of a detention. *Id.* (citations omitted). But Francis's undisputed conduct in failing to comply with Deputy Earl's commands, and his subsequent active resistence, posed a threat to the Deputies' safety justifying the use of handcuffs.

On balance, in weighing the gravity of the intrusion of Francis's Fourth Amendment rights against the government's interests, and drawing all reasonable inferences in Francis's favor, the Court cannot say, as a matter of law, that the degree of force Deputies Secor, Earl and Munter used was objectively reasonable under the circumstances. For qualified immunity purposes, Francis's right to be free from excessive force in the context of a *Terry* stop was clearly established at the time of the Deputies' conduct in July 2011. But because genuine issues of material fact exist as to the type and amount of force applied by the Deputies, the Court cannot conclude, as a matter of law, that it would be objectively reasonable for an officer, in Deputies Earl, Secor, or Munter's position, to believe that what he or she was doing would not violate Francis's Fourth Amendment rights. Thus,

the Deputies have not shown that they are entitled to summary judgment based on qualified immunity.

Conversely, viewing the facts favorably to the Deputies, the Court cannot conclude, as a matter of law, that any force Deputies Secor, Earl and Munter used was not objectively reasonable under the circumstances, or that they violated Francis's Fourth Amendment rights. Thus, Francis's motion should be denied in this respect.[6]

### b. Other Officers at the Scene

Law enforcement officers may be liable under 42 U.S.C. § 1983 for failing to act on the basis that they "have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). But "officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id*. The opportunity to intercede must be realistic. *Id*., at 1290. Thus, officers who were not present where the alleged constitutional violation occurred could not have had a realistic opportunity to intercede and prevent the violation. *Id*.

---

[6] Francis also asserts an excessive use of force claim against Deputies Earl, Secor, and Munter under the Montana Constitution, which survives summary judgment for the same reasons that his § 1983 excessive force claim does. *See, e.g., Todd v. Baker*, 2012 WL 1999529 * 8 (D. Mont. 2012) (excessive use of force jurisprudence the same under the Montana Constitution and the Fourth Amendment to the United States Constitution).

Francis seeks to hold MHP Troopers Walrath, Sulages, and Braun liable for failing to intercede and prevent Deputies Earl, Secor, and Munter from allegedly employing excessive force. But Francis fails to establish the Troopers had a realistic opportunity to intercede in the alleged use of force. Consequently, the Defendant Troopers' motion should be granted in this respect.

Francis suggests, without any supporting evidence, that the Troopers directly participated in the use of force against Francis. The Troopers' motion for summary judgment should also be granted in this respect.

### 3.    Unlawful Arrest

Francis claims Trooper Sulages unlawfully arrested him when he returned to the Howells' residence after transporting Marion to the scene of the accident.

A claim asserting that a law enforcement officer unlawfully detained or arrested a person "is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause[.]" *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (quoting *Lacey v. Maricopa County*, 693 F.3d 896, 918 (9th Cir. 2012) (en banc)). "Probable cause exists if the arresting officers 'had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe [there was a fair probability] that [a citizen] had committed or was committing a crime.' " *Id*., at 1097-98 (quoting *Maxwell v. County of San Diego*, 697 F.3d 941, 951 (9th Cir.

2012)); *Hart v. Parks*, 450 F.3d 1059, 1066 (9ᵗʰ Cir. 2006) ("fair probability"). An officer may rely upon information provided by other law enforcement officers, *United States v. Hensley*, 469 U.S. 221, 231 (1985), and may rely upon inadmissible evidence, "hearsay and upon information received from informants, as well as upon information within the [officer's] own knowledge that sometimes must be garnered hastily," *Hart*, 450 F.3d 1059, 1066 (quoting *Franks v. Delaware*, 438 U.S. 154, 165 (1978)). The court need not find probable cause existed for the specific offense identified by the law enforcement officer on the scene. Rather, the court need only be satisfied that probable cause existed "for *any* offense." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1147 (9ᵗʰ Cir. 2012) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152-154 (2004)).

When Trooper Sulages returned to the Howells' residence, he knew Marion and Francis had picked up the driver from the accident scene and taken him to their residence. Upon questioning by Trooper Sulages, Francis refused to identify the driver or allow Trooper Sulages to enter the home to check on the driver. At that point in time, Trooper Sulages had probable cause to arrest Francis for obstructing justice. Trooper Sulages is entitled to qualified immunity on this claim.[7]

_____

[7] Because Trooper Sulages had probable cause to make the arrest, Francis's state law claim for false arrest also fails as a matter of law. *See, e.g., Dean v. Sanders County*, 204 P.3d 722, 727 (Mont. 2009) (an arrest is lawful if supported

## B.    Marion's Claims

Marion claims that Defendants are liable under 42 U.S.C. § 1983 for violating her Fourth Amendment rights by: (1) unlawfully entering her house; (2) unlawfully detaining her; (3) unlawfully arresting her; (4) failing to administer *Miranda* warnings; (5) maliciously prosecuting her; and (6) failing to preserve evidence.

### 1.    Unlawful Entry

It is undisputed that both Deputy Secor and Trooper Sulages entered the Howells' home on June 26, 2011, without a warrant authorizing them to do so.

"Searches and seizures inside a home without a warrant are presumptively unreasonable." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (citations and quotations omitted).  However, "the voluntary consent of a party who has authority over the premises renders the warrantless entry of a person's home by law enforcement personnel constitutionally valid." *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018 (9th Cir. 2008) (*citing United States v. Matlock*, 415 U.S. 164, 169-71 (1974).  But consent will not be inferred "in the absence of a request by the officers or ongoing affirmative cooperation by the suspect." *Id.* (citations omitted).  "[I]n the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free

by probable cause).

and voluntary consent. We will not infer both the request and the consent." *Id.* (quotation omitted).

### a. Deputy Secor's Entry

Deputy Secor asserts he entered the Howells' home with the permission of the Howells' grandson, CC. Specifically, he states that CC "opened the door, went inside, [and] held the door open" for him. (Doc. 74-3 at 6.) In contrast, CC testified at his deposition he neither held the door open for, nor invited in, any of the law enforcement officers. (Doc. 60-1 at 69.)

There is a genuine issue of material fact as to whether Deputy Secor had permission to enter and remain in the Howells' residence. Thus, Deputy Secor is not entitled to summary judgment on the basis of qualified immunity. If he did enter the home without permission, a reasonable officer in his position would have understood that entering the home without a warrant, consent, or exigent circumstances would violate the Fourth Amendment.[8] *Lopez-Rodriguez*, 536 F.3d at 1018.

The Howells again assert that the other Defendants are all liable either as integral participants in, or for failing to intercede in, Deputy Secor's allegedly wrongful conduct. But because the Howells have not pointed to any evidence that

---

[8] Marion's corresponding state law claim that Deputy Secor violated Article II, section 11 of the Montana Constitution by entering her home without a warrant survives for the same reasons.

any other Defendant integrally participated in or had a realistic opportunity to intercede in Deptuy Secor's conduct, the other Defendants are entitled to summary judgment in this respect.

b.    Trooper Sulages' Entry

Trooper Sulages also moves for summary judgment dismissing the Howells' Fourth Amendment claims arising from his own entry into the home. He argues the evidence establishes that he entered the house after Secor was already inside the home and, therefore, he is not liable for any unlawful entry that may have occurred. The Court agrees.

Where an individual officer does not personally participate in an alleged constitutional violation, that officer's mere presence at the scene of the violation is insufficient to impose liability on that officer. *Motley v. Parks*, 432 F.3d 1072, 1082 (9th Cir. 2005), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012). In *Motley*, law enforcement officers unlawfully entered an apartment and conducted a search of the apartment. Subsequently, a federal agent joined the other law enforcement officers who were already inside the apartment. *Motley*, 432 F.3d at 1076. Although the federal agent had entered the apartment, the court affirmed the grant of summary judgment in favor of the agent on the basis that the agent had not personally participated in either the alleged unlawful entry or the search of the apartment. *Id*.

The undisputed evidence here establishes that Trooper Sulages entered the Howells' home after Deputy Secor had already gained entry. Trooper Sulages states that while he was outside the house, he learned that another officer had gone inside. Trooper Sulages then returned to the door of the house and found Deputy Secor holding the door open for him. The Howells do not dispute Trooper Sulages' version of the timing of the events surrounding his entry into the house.

The undisputed evidence thus establishes that Trooper Sulages did not personally participate in Deputy Secor's alleged unconstitutional entry into the home. Under *Motley*, Sulages is entitled to qualified immunity and summary judgment dismissing this Fourth Amendment claim.[9]

## 2. Unlawful Detention

Deputy Secor and Trooper Sulages encountered Marion in her home and questioned her about the accident. Marion contends the officers' conduct amounted to an unlawful seizure because she did not feel free to leave.

Under the Fourth Amendment, a warrantless seizure of an individual inside a home is "presumptively unreasonable." *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (citation and quotation omitted). This presumption is rebuttable if either one of two exceptions is satisfied: exigency or emergency. *Id*.

---

[9] Marion's corresponding state constitutional claim is properly dismissed on the same grounds.

Trooper Sulages and Deputy Secor do not invoke either of these exceptions.[10]  The

dispositive issue, therefore, is whether Trooper Sulages and Deputy Secor's

conduct constituted a seizure of Marion.  For the reasons discussed, the Court

finds genuine issues of material fact exist precluding resolution of that issue on

summary judgment.

In assessing whether a seizure has occurred, the courts consider the "totality

of the circumstances," (*Green v. City and County of San Francisco*, ___ F.3d ___,

2014 WL 1876273, *6 (9th Cir. 2014), and focus "on the perspective of the person

seized[,]" *Johnson v. Bay Area Rapid Transit District*, 724 F.3d 1159, 1176 (9th

Cir. 2013) (quotation and citations omitted).  The ultimate question is "whether a

reasonable innocent person in [the same] circumstances would not have felt free to

leave after brief questioning."  *Id*.  The relevant inquiry is "how a reasonable

person in the position of the individual being questioned would gauge the breadth

of his or her 'freedom of action'" or "perceive his or her freedom to leave."

*Stansbury v. California*, 511 U.S. 318, 323-325 (1994).  "This is a highly

fact-specific inquiry that considers the intrusiveness of the methods used in light

---

[10] A warrantless seizure of an individual inside a home falls under the exigency exception, which derives from law enforcement officers' criminal investigatory functions and requires both probable cause and exigent circumstances.  *Struckman*, 603 F.3d at 738.  Consequently, the reasonable suspicion standard applicable to an investigatory stop under *Terry* does not apply to a seizure inside a home.  *Id*.

of whether these methods were "reasonable given the specific circumstances." *Green*, 2014 WL 1876273 at *6.

One relevant factor to consider in assessing whether an unlawful seizure occurred is whether the individual consented to the seizure. "[C]onsent is a recognized exception to the Fourth Amendment's protection against unreasonable searches and seizures." *United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012). It is the government's burden to establish that "consent was given freely and voluntarily." *Id*. (citation and quotation omitted).

Significantly, it was CC, not Marion herself, who is alleged to have given Deputy Secor consent to enter the house. And Marion describes her encounter with Trooper Sulages and Deputy Secor as confrontational and coercive. She asserts that "two armed, uniformed law enforcement officers [...] simply barged into my house" and that they forced their way in. (Doc. 74-3 at 46.) She claims they stood close to her in a "threatening manner" and interrogated her about the events that night, speaking to her with "angry, harsh, intimidating tones and words." (*Id*. at 47). Marion says she was "bewildered and frightened," and claims she told the officers she did not want to answer any more questions without a lawyer, but they kept questioning her. (Doc. 46-3 at 10). Marion states, "I did not feel at liberty to remove myself from their presence." (Doc. 74-3 at 47.) She indicates that the officers did not tell her she could have asked them to leave, and

she felt like she "was their captive and had to let them stay in my house as long as they wanted." (*Id*.)

In light of this testimony, genuine issues of material fact exist as to whether Marion consented to Trooper Sulages and Deputy Secor's questioning her in the home. Thus, Trooper Sulages and Deputy Secor are not entitled to summary judgment dismissing Marion's claim that the officers' conduct constituted an unlawful seizure.

To the extent Marion argues that Trooper Sulages unlawfully detained her when he placed in the back of his patrol car and took her to the scene of the accident, this alleged detention is not separate from Marion's alleged detention inside her house. The discussion between Trooper Sulages and Marion about going to the scene of the accident commenced while they were inside Marion's home. Because questions of fact exist as to whether Trooper Sulages seized Marion inside her house, the events surrounding Trooper Sulage's conduct in transporting Marion to the scene of the accident constitute a seamless continuance of the alleged seizure that may have occurred inside the home. Although Marion's deposition testimony suggests it may have been her own idea to go to the scene of the accident, and she may have voluntarily accompanied Trooper Sulages to the scene in the back of his car, those circumstances do not necessarily negate the seizure to which she may have already been subject. Thus, it remains a question

for the jury to decide whether Marion felt free to decline to go to the scene of the accident in Trooper Sulages' patrol car.[11]

### 3. Unlawful Arrest

Marion argues that Trooper Walrath unlawfully detained and arrested her when she was at the scene of the motor vehicle accident. The Court disagrees.

The video from the scene of the accident reflects that Marion tells Troopers Walrath, Sulages, and Braun that she and Francis had picked up the person believed to be the driver and taken him to their home. Upon questioning by the Troopers, Marion also acknowledged the driver was "probably" a relative, but she not know who he was.

At that point in time, Trooper Walrath had probable cause to believe that Marion had obstructed justice as defined in Mont. Code Ann. § 45-7-303(2)(d).[12]

### 4. *Miranda* Violations

Marion claims Troopers Sulages and Walrath subjected her to custodial interrogation without advising her of her *Miranda* rights, rendering them liable for violating her Fifth Amendment right against self-incrimination. But because

---

[11] Once again, Marion's corresponding state constitutional claims survive for the same reasons.

[12] Because Trooper Walrath had probable cause, Marion's state law claim for false arrest also fails as a matter of law. *Dean v. Sanders County*, 204 P.3d 722, 727 (Mont. 2009).

"failure to read *Miranda* warnings does not violate [a citizen's] constitutional rights and cannot be grounds for a § 1983 action," *Chavez v. Martinez*, 538 U.S. 760, 767, 770 (2003), Marion's claim fails as a matter of law. Troopers Sulages and Walrath are entitled to summary judgment in this regard.

### 5. Malicious Prosecution

Marion argues that by issuing her a citation for obstructing justice, Trooper Walrath is liable for malicious prosecution. Marion is absolutely wrong.

"[T]o prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (*quoting Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)).

After the night of the underlying violations, Trooper Walrath continued his investigation of the incident by interviewing Marion and Francis on July 14, 2011. During the interview, Marion admitted that she knew who the driver of the crashed vehicle was, thus controverting her denial of that knowledge on the night of the crash. Immediately following that interview, Trooper Walrath issued Marion a criminal citation charging her with the offense of obstructing justice based on her conduct in picking up the driver from the scene, driving him home, and then lying

to law enforcement officers about not knowing who the driver was.  (Doc. 66-1 at 30).  The totality of the information known to Trooper Walrath provided him with probable cause to issue the citation.  Marion's § 1983 claim for malicious prosecution fails as a matter of law.[13]

### 6.    Failure to Preserve Evidence

Marion claims Trooper Sulages is liable for failing to preserve exculpatory evidence regarding her alleged criminal conduct because he did not record what she alleges was a custodial interrogation inside her home.  Trooper Sulages explains that he thought he had recorded their conversation because he had turned on his lapel microphone, but he learned later that the recording system did not record their conversation.  (Doc. 66-6 at 4.)

A law enforcement officer's failure to collect or preserve potential exculpatory evidence may violate the Due Process Clause of the Fourteenth Amendment, but only if the officer acted in bad faith.  *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003).  The officer must have engaged in "a conscious effort to suppress exculpatory evidence," which means that a plaintiff must establish that exculpatory evidence existed in the first instance. *Cunningham*, 345 F.3d at 812.

---

[13]  The existence of probable cause similarly defeats Marion's state law claim for malicious prosecution.

Although Marion claims Trooper Sulages wrongfully failed to record their conversation, she does not point to any allegedly exculpatory evidence that might have been collected had his recording equipment been working properly. She claims that Trooper Sulages ignored her repeated requests to speak to a lawyer, but those statements have nothing to do with whether she was guilty of obstructing justice and so do not constitute exculpatory evidence. Therefore, Trooper Sulages' failure to record his conversation with Marion does not give rise to a Fifth Amendment violation, and her claim to the contrary should be dismissed.

### C. Joint Claims

#### 1. Official Capacity Claims

Gallatin County Sheriff's Office Deputies Earl, Munter, Secor, Anderson and Johnston move to summarily dismiss the Howells' § 1983 claims to the extent the claims are asserted against them in their official capacities. An official-capacity suit "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent" and is treated as a suit against the employing governmental entity. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotation marks omitted). Because the Howells have named Gallatin County as a defendant, their official capacity claims against the Deputies are superfluous and subject to summary dismissal on that basis. *See, e.g., Hafer*, 502 U.S. at 25.

#### 2. James Cashell

Defendant James Cashell was the Sheriff of Gallatin County at the time of the events that gave rise to this lawsuit. He moves for summary judgment on all of the § 1983 claims leveled against him.

Supervisory officials like Cashell may not be held liable under § 1983 under a theory of respondeat superior. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Rather, they can only be held liable under § 1983 if they themselves personally violated a constitutional right. *Id*. It is undisputed that Sheriff Cashell had no involvement with the encounter that occurred between his deputies and Howells.

The Howells claim, moreover, that Cashell is liable under § 1983 for failing to implement policies that purportedly would have protected them from the Sheriffs Deputies' allegedly wrongful conduct. But to prevail on such a claim the plaintiff "must show that [the supervisor's] failure to train amounted to deliberate indifference[]" to the need for more or different policies and training. *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998). A supervisor can be liable if "the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the [supervisor]... can reasonably be said to have been deliberately indifferent to the need." *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

The Howells fail to point to any evidence that Sheriff Cashell should have

32

known he needed to develop and implement the additional policies suggested by the Howells, or that the need for more or different policies and training was in any way obvious to him. They have not presented evidence suggesting prior incidents have occurred giving rise to the need for more or different policies, that Sheriff Cashell was aware of any such prior occurrences, or that Sheriff Cashell was deliberately indifferent to the need for more or different policies. To impose liability under section 1983 against a supervisor, a plaintiff must establish the supervisor's <u>prior</u> knowledge of unconstitutional conditions or unconstitutional conduct committed by subordinates that would give the supervisor notice of the need for changes. *See Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011). *See also Dougherty v. City of Covina*, 654 F.3d 892, 900-01 (9th Cir. 2011). Because the Howell's have not pointed to any such evidence in this case, Sheriff Cashell's summary judgment motion should be granted with respect to the § 1983 claims against him.

### 3. Gallatin County

Defendant Gallatin County moves for summary judgment as to the Howells' § 1983 claims on the ground that the Howells have not come forward with any evidence that a policy, practice, or custom was the moving force behind any of the alleged constitutional violations.

Local governmental entities can be held liable under section 1983, but only

if "a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty*, 654 F.3d at 900. *See also Monell v. Dept. of Social Services*, 436 U.S. at 690-94. The custom or practice must be "so 'persistent and widespread' that it constitutes a 'permanent and well settled [municipal] policy,' which means that liability "may not be predicated on isolated or sporadic incidents." *Trevino. v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). Likewise, a "single failure to discipline" a law enforcement officer, by itself, cannot give rise to a municipality's liability under *Monell*. *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003), *reversed on other grounds,* 543 U.S. 194 (2004). To hold otherwise would be to "smuggle respondeat superior liability into section 1983 law, [creating an] end run around *Monell*." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1253 (9th Cir. 2010) (quotation and citation omitted).

This is precisely what the Howells are attempting to do here. They contend the County is liable for not disciplining or reprimanding any of the Sheriffs Deputies for allegedly violating their constitutional rights on the night in question. To the extent the Howells are thus seeking to impose liability on Gallatin County for what amounts to a single, isolated incident, their § 1983 claims fail.

The same is true with respect to the Howells' claim that the County should be held liable under § 1983 for failing to implement policies they maintain would

have prevented the Deputies from violating their constitutional rights that night. *See, e.g., Clouthier*, 591 F.3d at 1249 (a governmental entity may be held liable for "acts of omission" like failing to develop and implement policies if the need for new policies was so obvious that government's omission "amounts to 'deliberate indifference' to a constitutional right"). But again, the Howells rely solely on the events that transpired on the night in question in an attempt to impose municipal liability against the County. The Howells have not come forward with any evidence that the County was deliberately indifferent to the need for new or different policies. Their § 1983 claims against the County are properly dismissed.

### D.     Remaining Claims Under Montana Law

#### 1.     Statutory Immunity

Deputies Cashell, Earl, Secor, Munter, Anderson, and Johnston assert they are entitled to immunity from the Howells' state law claims under Mont. Code Ann. § 2-9-305(5). Because Gallatin County acknowledges that the Deputies were acting in the course and scope of their employment on the night of June 26, 2011, the Howells concede the Deputies are entitled to the immunity provided by Mont. Code. Ann. § 2-9-305(5).

#### 2.     Other Constitutional Violations

The Howells seek to impose liability on the Defendants for allegedly

violating their rights to dignity, privacy and due process under the Montana

Constitution.  Mont. Const. art. II, §§ 4, 10, and 17.  The Defendants are entitled

to summary judgment upon these claims.

Under analogous federal decisional law, the "explicit textual source" rule

prohibits a plaintiff from "doubling up" multiple constitutional claims based on

the same conduct.  "Where a claim can be analyzed under 'an explicit textual

source' of rights in the Constitution, a court may not also assess the claim under

another, 'more generalized,' source." *Ramirez v. Butte–Silver Bow County*, 298

F.3d 1022, 1029 (9th Cir. 2002) (quoting *Graham v. Connor*, 490 U.S. 386,

394–95(1989)).  Because the Montana Supreme Court looks to federal

constitutional jurisprudence in analyzing claims under the Montana Constitution,

this Court predicts it would adopt the explicit textual source rule.  *Peschel v. City

of Missoula*, 664 F. Supp. 2d 1149, 1161-62 (D. Mont. 2009).

The Howells contend Defendants are liable for their conduct on their

property, for entering their home, for using excessive force, and for detaining and

arresting them.  But those claims must be analyzed under the "unreasonable

searches and seizures" provision of the Montana Constitution, Article II, section

11, and not under the more generalized provisions regarding human dignity,

privacy, and due process in Article II, sections 4, 10, and 17, respectively.

Consequently, the Howells' dignity, privacy, and due process claims are subject to

dismissal.  *See, e.g., Hubbard v. Sheffield*, 2013 WL 5437037, *16 (D. Mont.

2013).

### 3.    Negligence

The State of Montana and Gallatin County move for summary judgment

dismissing the Howells' claims for negligence on the narrow ground that the

Howells cannot establish the existence of any viable legal duty with which the

individual State and County employees failed to comply.  They also argue the

Howells' negligence claims are barred by the public duty doctrine.  It is important

to emphasize that both the State of Montana and Gallatin County's motions are

limited to these referenced arguments.  They do not present the alternate

arguments that the Howells' claims fail because the undisputed evidence of record

establishes the individual Defendants acted with the requisite degree of care or did

not cause the Howells any damages.

The common and statutory law of Montana impose a duty upon all

individuals to "use the degree of care that an ordinarily prudent person would have

used under the same circumstance."  *Barr v. Great Falls International Airport

Authority*, 107 P.3d 471, 477 (Mont. 2005); Mont. Code Ann. § 27-1-701.  The

failure to exercise reasonable care is negligence.  The establishment of a legal duty

is a prerequisite to a claim of negligence because there can be no negligence in the

absence of a legal duty owed by a defendant to a plaintiff.  *Slack v. Landmark Co.*,

267 P.3d 6, 10 (Mont. 2011). *See also Peterson v. Eichhorn*, 189 P.3d 615, 620-21 (Mont. 2008). The question of whether a legal duty exists is an issue of law for the court to decide. *Slack*, 267 P.3d at 10.

        a.     <u>State of Montana</u>

        (1)    *Negligent Investigation*

The Howells argue Troopers Walrath, Sulages and Braun breached a duty of reasonable care in the conduct of their investigation. The State of Montana argues there exists no legal duty supporting a claim of a negligent investigation.

But the Court concludes that as a matter of law, the basic duty of care requiring individuals "to use the degree of care that an ordinarily prudent person would have used under the same circumstance," applies to the conduct of Troopers Walrath, Sulages, and Braun in investigating the potential offense of obstruction of justice committed by Francis and Marion. *See Spreadbury v. Bitterroot Public Library*, 862 F. Supp. 2d 1054, 1059 (D. Mont.) (assuming without deciding that the duty of reasonable care applies to law enforcement officers' conduct in investigating criminal conduct). The State of Montana's summary judgment motion should be denied in this respect.

        (2)    *Spoliation of Evidence*

The State of Montana argues the Howells have no viable claim for the negligent destruction or spoliation of evidence arising from Trooper Sulages'

failure to successfully record his conversation with Marion while they were inside her house. The State is correct. "The torts of intentional and negligent spoliation of evidence are not recognized in Montana as independent causes of action against a direct party...[t]hey apply only to nonparties to the litigation." *Harris v. State of Montana*, 294 P.3d 382, 389 (Mont. 2013) (citation omitted).

(3) <em>Maintaining Recording Equipment</em>

The Howells claim Trooper Sulages is liable to them for negligently failing to properly maintain his recording equipment in order to collect evidence. The State retorts that Trooper Sulages had no legal duty to gather and collect evidence on behalf of the Howells. The State is correct.

Law enforcement officers generally have no affirmative legal duty to gather and collect evidence, in contrast to the legal duty that exists requiring officers to preserve evidence after it is gathered and collected. *State v. Wagner*, 296 P.3d 1142, 1146-48 (Mont. 2013).

But the Howells take the position that the written policies of the Montana Highway Patrol created an affirmative duty upon Trooper Sulages to properly maintain his equipment in order to record his encounter with the Howells. The State is correct in its assertion that the public duty doctrine precludes liability predicated upon the general policy of the Montana Highway Patrol requiring its troopers to maintain and repair sound and video equipment.

The public duty doctrine in Montana provides that "a governmental entity cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff." *Eklund v. Trost*, 151 P.3d 870, 878 (Mont. 2006) (quoting *Massee v. Thompson*, 90 P.3d 394, 403 (Mont. 2004)). The doctrine "serves the important purpose of preventing excessive court intervention into the governmental process by protecting the exercise of law enforcement discretion." *Nelson v. Driscoll*, 983 P.2d 972, 977 (Mont. 1999) (quotation and citation omitted).

The general policy requirements upon which the Howells rely are duties owed, if at all, to the general public, not duties owed directly to the Howells. The State of Montana is entitled to summary judgment on this claim.

        b.    <u>Gallatin County</u>

Gallatin County similarly moves for summary judgment dismissing the Howells' claims of negligence. Gallatin County argues the negligence claims are barred by the public duty doctrine. Specifically, it argues the doctrine bars the Howells' negligence claims arising from Deputy Secor's conduct in investigating the accident while he was with Marion inside her house, and the Howells claims' arising from Deputies Secor, Earl and Munter's use of force against Francis. For the reasons stated, the Court disagrees.

The Howells' negligence claim arising from Deputies Secor, Earl and Munter's use of force against Francis is predicated upon conduct committed by those Deputies against Francis which allegedly caused Francis's injuries. The claim arises from a specific duty of care that the Deputies owed to Francis – a duty to act as a reasonable and prudent person would act under the circumstances – not from any duty owed to the general public. And the claim alleges the Deputies' own conduct caused Francis's injuries. The public duty doctrine is not implicated in the first instance where, as here, a law enforcement officer is the sole alleged cause of the plaintiff's injury. Thus, the public duty doctrine does not apply to bar Francis's claim of negligence stemming from Deputies Secor, Earl and Munter's use of force against him. *Ratcliff v. City of Red Lodge*, 2014 WL 526695, *6-7 (D. Mont. 2014).

Similarly, Deputy Secor's conduct towards Marion while investigating the events on June 26, 2011, is based on his own conduct towards Marion. Those circumstances give rise to a duty of ordinary care in conducting a reasonable investigation that Deputy Secor owed to Marion, not from a duty he owed to the general public. Because Marion's negligence claim alleges that Deputy Secor was himself the sole injurious force, the public duty doctrine is inapplicable. Therefore, the public duty doctrine does not bar the Howells' claims of negligence against Deputy Secor.

Gallatin County's motion for summary judgment should be denied in this respect.

### 4. Negligence Per Se

"Negligence per se is a failure to comply with a legal mandate." *Doyle v. Clark*, 254 P.3d 570, 576 (Mont. 2011). To prevail on a claim of negligence per se, a plaintiff must establish, among other things, that the defendant violated a particular statute, and "that the statute allegedly violated allows a private right of action." *Id.* at 576-77. "[I]f the statute in question may be enforced only by the state, a private individual may not attempt to recover for violation of the statute under a negligence per se claim." *Id.* at 577.

Marion contends Deputy Secor and Trooper Sulages were negligent per se because they violated Mont. Code Ann. § 46-6-105, which provides that "a person may not be arrested in the person's home or private dwelling place at night for a misdemeanor committed at some other place[.]" Even assuming the Defendants violated this statute, the available remedy under state law is the suppression of evidence obtained following the arrest. *City of Billings v. Whalen*, 790 P.2d 471, 475 (Mont. 1990). Because there is an available remedy, and nothing in the statute "suggests that the Legislature intended to grant individuals a private right of action," the statute does not provide a private right of action. *See, e.g., Doyle*, 254 P.3d at 576-77. Marion's claim for negligence pe se fails accordingly.

The Howells next argue that Troopers Sulages and Walrath violated Mont. Code Ann. § 46-6-312, which requires that "[a] peace officer making an arrest without a warrant shall inform the person to be arrested [...] of the cause of the arrest[.]"  But the available remedy for a violation of this statute is the suppression of evidence,[14] and there is nothing in the statute suggesting that the Legislature intended to give individuals a private right of action.   The State of Montana and Gallatin County are thus entitled to summary judgment dismissing the Howells' claims of negligence per se.

### 5.    Emotional Distress

The Montana Supreme Court has established a heightened standard of proof for independent claims of negligent or intentional infliction of emotional distress. *Sacco v. High County Independent Press, Inc,* 896 P.2d 411, 429 (Mont. 1995). A plaintiff claiming  intentional or negligent infliction of emotional distress must demonstrate that he suffers from "serious or severe" emotional distress.  *Sacco*, 896 P.2d at 429.   To satisfy this standard, a plaintiff must ultimately prove that his emotional distress was "so severe that no reasonable person could be expected to endure it."  *Lorang v. Fortis Ins. Co.*, 192 P.3d 186, 222 (Mont. 2008) (*quoting Sacco*, 896 P.2d at 425-26, 428-29)).

Defendants argue that the Howells have not presented evidence that they

---

[14] *State v. Kelm*, 300 P.3d 687, 693 (Mont. 2013).

suffered from serious or severe emotional distress, as defined by *Sacco*. The Court agrees. Marion testified at one point in her deposition that she had mentioned emotional distress symptoms to her doctor, and stated that her doctor prescribed both sleep and pain medicine. (Doc. 102 at 17, and Doc. 46-3 at 24.). But in response to the question of whether she had ever "seen a doctor about any of this or a psychologist or a psychiatrist or counselor of any kind," Marion answered "[n]o, I don't think we felt like we could afford it." (*Id.*) Marion stated the physical symptoms changed her life "[d]rastically," but she explained only that she was not "nervous" before the events on June 26, 2011. Francis similarly presents limited information regarding his alleged emotional distress. In his deposition Francis described his emotional distress as follows: "[I]t doesn't feel friendly to us anymore. We lock our doors during the daytime now. It's just a matter of [...] being uncomfortable." (Doc. 102 at 17, and Doc. 46-9 at 11.)

The Court concludes that the Howells' general statements about sleep and pain medication, nervousness, unfriendliness, and uncomfortableness fail to raise a genuine issue of material fact as to whether the Howells suffered emotional distress that was so severe that no reasonable person could be expected to endure it as required under *Sacco*. Thus, the State of Montana and Gallatin County are entitled to summary judgment dismissing the Howells' independent tort claims of negligent and intentional infliction of emotional distress. To the extent the

Howells request compensation for emotional distress as an element of damages, however, "[t]he measure of [their] actual damages is a factual matter for the jury to determine." *Lorang v. Fortis Ins. Co.*, 192 P.3d 186, 224 (Mont. 2008).

### 6.    Defamation

The tort of defamation occurs through either libel or slander.[15]  Mont. Code Ann. § 27-1-801.  In general, liability for libel and slander can arise from a false and unprivileged publication or statement made about a person which causes harm to that person.  Mont. Code Ann. §§ 27-1-802 and 803.  Specifically, libel is defined as:

> a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation that exposes any person to hatred, contempt, ridicule, or obloquy or causes a person to be shunned or avoided or that has a tendency to injure a person in the person's occupation.

Mont. Code Ann. § 27-1-802.

In turn, slander is defined, in part, as a false and unprivileged publication other than libel that, inter alia, "by natural consequence causes actual damage." Mont. Code Ann. § 27-1-803(5).

The Howells identify two events which they maintain give rise to a claim of defamation.  First, the Howells contend that all of the Defendants' law enforcement presence at their residence on June 26, 2011, was open and obvious

---

[15] "Slanderous words are spoken words, whereas libelous words are written." *Tindall v. Konitz Contracting, Inc.*, 783 P.2d 1376, 1382 (Mont. 1989).

to all of the Howells' neighbors and was defamatory in nature. This claim, however, fails on the grounds that defamation is predicated only upon a spoken or written publication of words. The mere presence of law enforcement officers at a personal residence does not, as a matter of law, constitute the publication of words.

Second, the Howells contend Defendants are liable for statements made about Marion in the judicial proceedings spawned by the criminal citation issued to her by Trooper Walrath. Statements made in judicial proceedings are privileged under Mont. Code Ann. § 27-1-804(2) and cannot serve as the basis of a defamation claim.

The Defendants are entitled to summary judgment on the Howells' claim for defamation.

### 7. Punitive Damages

#### a. Gallatin County

Gallatin County moves for summary judgment dismissing the Howells' claim for punitive damages on the grounds that they cannot present evidence establishing any of the individual Gallatin County employees acted with actual malice as required under Mont. Code Ann. § 27-1-221.

The Howells assert that punitive damages may be warranted based on Deputy Secor's alleged improper use of the arm bar maneuver on Francis. Deputy

Secor admitted that the purpose of the arm bar is not to injure a person. (Doc. 74-3 at 3.) The Howells assert Deputy Secor improperly executed the arm bar procedure because Deputy Secor executes the maneuver by holding the arm "straight" (doc. 74-3 at 3), but a proper arm bar maneuver requires that the officer hold the arm bent across the person's back. (Doc. 103-1 at 7.) The Howells assert Deputy Secor's conduct injured Francis's shoulder.

Given the events surrounding Deputy Secor's use of force against Francis, the Howells have identified sufficient evidence raising a genuine issue of material fact as to whether Deputy Secor deliberately proceeded to act with conscious or intentional disregard or with indifference to the high probability of injury to Francis. Mont. Code. Ann. § 27-1-221(2). Therefore, Gallatin County's motion requesting dismissal of the Howells' claim for punitive damages should be denied.

### b. State of Montana

Mont. Code Ann. § 2-9-105 provides the State of Montana with immunity from punitive damages. Invoking that immunity, the State moves for summary judgment on the Howells' claim for punitive damages emanating from all of the Howells' state law claims. The State's conclusory argument consists of three sentences. (Doc. 70 at 32). The Howells' cursory argument in opposition consists of two sentences. (Doc. 97 at 37).

Glaringly absent from the State's briefing is any discussion of the interplay,

if any, between § 2-9-105 and Mont. Code Ann. § 2-9-305(5), which sets forth the State's obligations relating to the defense and indemnification of its employees. The issue of whether the State may invoke its immunity from punitive damages by acknowledging a defendant employee against whom a claim for punitive damages has been made was acting in the course and scope of his employment is much more complex than suggested by the State. The State's cursory brief does not establish its entitlement to summary judgment as to this issue.

Given the posture of this case, it is recommended that the State's motion on the issue be denied and the claim for punitive damages be presented to the jury. If the jury makes an award of punitive damages, the issue of the State's entitlement to immunity may be fleshed out post-trial. In this manner, resolution of the issue by this Court – or perhaps by the Montana Supreme Court on certification – can be made on an informed basis.

### 8. Acting in Concert

The Howells assert a cause of action alleging Defendants are liable for acting in concert. Under Montana law, an individual defendant can be held liable for the tortious conduct of another individual if the former "knows that the other's conduct constitutes a breach of duty and [the former] gives substantial assistance or encouragement to the other so to conduct himself." *Sloan v. Fauque*, 784 P.2d 895, 896 (Mont. 1989) (quoting Restatement (Second) of Torts § 876). Thus,

"where two or more persons commit tortious acts in concert, all are liable for the tortious acts of anyone." *Id*. *See also Oberson v. United States*, 311 F. Supp. 2d 917, 960 (D. Mont. 2004).

The State of Montana moves for summary judgment dismissing the Howells' acting-in-concert theory of liability. The Howells have not presented any evidentiary material raising a genuine issue of material fact suggesting that any of the individual Defendant employees of the State of Montana provided substantial assistance or encouragement to any other Defendant while knowing the latter was committing a tortious act. The State's motion should be granted in this regard.

Gallatin County similarly moves for summary judgment dismissing the Howells' acting-in-concert theory. But because Deputies Secor, Earl and Munter are potentially liable for negligence and the excessive use of force against Francis, there are genuine issues of material fact as to whether the Deputies provided substantial assistance to each other, knowing that one of the other two was committing a tortious act. Therefore, Gallatin County's motion should be denied in this respect.

## IV. Conclusion

For the reasons set forth above,

IT IS RECOMMENDED that the State of Montana, and Defendants

Walrath, Sulages and Braun's summary judgment motions be GRANTED in part and DENIED in part as discussed.

IT IS FURTHER RECOMMENDED that Gallatin County and Defendants Cashell, Secor, Earl, Munter, Anderson, and Johnston's summary judgment motions be GRANTED in part, and DENIED in part as discussed.

IT IS FURTHER RECOMMENDED that the Howells' motion for summary judgment be DENIED.[16]

DATED this 30th day of May, 2014.

Jeremiah C. Lynch
United States Magistrate Judge

---

[16] The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel on or before June 9, 2014, and any response by the opposing party must be filed on or before June 13, 2014. *See United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978) (the court need not give the parties the full ten day period set forth in 28 U.S.C. § 636(b)(1) within which to file objections).